**Opinion issued July 2, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00093-CV**

———————————

**MOHAMMAD GANDOMKAR, Appellant**

**V.**

**BUCKINGHAM ORIENTAL RUGS AND JEWELERS, INC., Appellee**

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-72180**

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, Mohammad Gandomkar, challenges

the trial court's order granting the special appearance filed by appellee, Buckingham

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7).

Oriental Rugs and Jewelers, Inc. ("Buckingham"), in Gandomkar's suit against Buckingham and others for fraud, civil conspiracy, promissory estoppel, quantum meruit, negligence, and declaratory relief. In his sole issue, Gandomkar contends that the trial court erred in granting Buckingham's special appearance.

We affirm.

## Background

In his petition, Gandomkar alleged that Abbas Mohammadzad was "an owner and officer" of Buckingham, a rug showroom located in Scranton, Pennsylvania, and was "the sole owner" of Ashly Fine Rugs, LLC ("Ashly"), another rug showroom located in Houston, Texas. In November 2019, Ashly sued its landlord and another tenant in the commercial building where Ashly was operating for damages to various "fine rugs" allegedly caused by two separate incidents in which water leaked onto the rugs in the showroom.[2]

Gandomkar filed a petition to intervene in Ashly's 2019 suit, alleging that he was "the owner of at least [thirty] 'Khotan'" rugs that were damaged in the water leaks, which he had "previously transferred to . . . Mohammadzad." Gandomkar noted that Ashly had previously estimated the thirty Khotan rugs that he owned to be "worth approximately $268,500." According to Gandomkar, he had transferred

---

[2] *See Ashly Fine Rugs, LLC v. Shadel Holdings, L.L.C. and Patio One Furniture, L.P.*, Cause No. 2019-82286, in the 190th District Court of Harris County, Texas.

those rugs to "Mohammadzad to be sold on consignment at one or both of . . . Mohammadzad's showrooms." "At some point, . . . Mohammadzad transferred a number of the consigned rugs from Buckingham's showroom in Pennsylvania to Ashly's showroom in Houston." And on Gandomkar's "information and belief," Mohammadzad, Ashly, and Buckingham were in "possession of at least [thirty], and as many as [sixty-eight]," Khotan rugs "consigned by . . . Gandomkar." Yet, in response to interrogatories served in Ashly's 2019 suit, Ashly "categorically denied" that Gandomkar was the owner of the Khotan rugs. According to Gandomkar, Ashly, acting through Mohammadzad, responded that "Gandomkar never owned the rugs in question" and Mohammadzad and Ashly indicated "elsewhere" that they intended to "keep damages and/or insurance proceeds for [Gandomkar's] Khotan rugs," with "no intention of compensating . . . Gandomkar for [them]."

Gandomkar further explained that after the trial court in Ashly's 2019 suit struck his petition to intervene, he filed this suit "to enforce his rights and to recover damages as the owner of the [sixty-eight] Khotan [rugs]" that he had "previously consigned, many of which remain[ed] in the possession of . . . Mohammadzad, Ashly, and[] Buckingham."

Gandomkar brought a fraud claim against Mohammadzad, alleging that Mohammadzad had "knowingly made a false promise to take possession" of

3

Gandomkar's sixty-eight Khotan rugs "on consignment and to compensate" Gandomkar if his rugs were sold, and Gandomkar justifiably relied on that "false promise" when he shipped those rugs "to . . . Mohammadzad in Pennsylvania, with the understanding that [Gandomkar] would eventually be compensated for his rugs."[3]

Further, Gandomkar brought civil conspiracy and vicarious liability claims against Buckingham.[4] As to his civil conspiracy claim against Buckingham, Gandomkar alleged that "Mohammadzad, Ashly, and Buckingham [had] engaged in a civil conspiracy to . . . obtain the benefit and value of [Gandomkar's] rugs without compensating him and, similarly, to keep any proceeds recovered" in Ashly's 2019 suit. As to his vicarious liability claim, Gandomkar alleged that "Buckingham [was] vicariously liable to [Gandomkar] for the conduct of . . . Mohammadzad under the theory of respondeat superior" because "Mohammadzad was an owner, agent, and/or officer of . . . Buckingham[] and was acting in the course and scope of his agency." Alternatively, Gandomkar sought to recover from Buckingham in quantum meruit.[5]

---

[3] Gandomkar also brought claims for civil conspiracy, promissory estoppel, and quantum meruit against Mohammadzad.

[4] Gandomkar also alleged claims for civil conspiracy and vicarious liability against Ashly.

[5] Gandomkar sought to recover from Ashly in quantum meruit as well.

4

And Gandomkar requested a declaration that he was the owner of the thirty Khotan rugs that were damaged.[6]

Buckingham then filed a special appearance, asserting that Gandomkar had failed to plead, in his petition, jurisdictional facts establishing that the trial court had personal jurisdiction over Buckingham. According to Buckingham, it had "operated a single oriental rug [showroom] in Scranton, Pennsylvania," which "shut down in or around 2007." Buckingham confirmed that it did not have, and had never: "owned any real estate in Texas"; "had an office or place of business in Texas"; "used, owned, or rented real or personal property in Texas"; "employed agents or employees in Texas"; "maintained bank accounts in Texas"; "kept books or records in Texas"; "paid any taxes in Texas"; "advertised for business in Texas"; or "consented to be sued or designate[d] an agent for service of process in Texas." Further, Buckingham asserted that its "only connection" with Texas was that Mohammadzad, Ashly's owner, had "moved to Texas after he closed down Buckingham."

Buckingham further observed that Gandomkar, in his petition to intervene in Ashly's 2019 suit, had alleged that in 2005, "nearly a decade before Ashly even existed as an entity," he shipped thirty-seven rugs from Uzbekistan to Buckingham in Scranton. And Buckingham asserted that as "a Pennsylvania company that [had]

---

[6] Gandomkar brought additional claims against other defendants.

shut down its only [showroom] in Pennsylvania [fifteen] years ago," the trial court lacked both specific and general jurisdiction over it.

Further, as to Gandomkar's civil conspiracy claim against Buckingham, Buckingham asserted that the jurisdictional contacts of Mohammadzad and Ashly could not be imputed to Buckingham "for the purpose of establishing personal jurisdiction." And Buckingham itself did not undertake any "purposeful action to establish minimum contacts with Texas." As to Gandomkar's vicarious liability claim against Buckingham, Buckingham pointed out that although Gandomkar had alleged that Buckingham was vicariously liable for Mohammadzad's acts because he was its officer and agent of Buckingham, Gandomkar had "fail[ed] to plead that . . . Mohammadzad performed any acts in Texas on behalf of Buckingham."

Additionally, Buckingham argued that the exercise of personal jurisdiction over it in Texas would offend traditional notions of fair play and substantial justice because "Buckingham ha[d] no relationship with Texas[] and Gandomkar ha[d] not alleged that [Buckingham] committed any wrongful act in Texas."

Buckingham attached to its special appearance an affidavit executed by Mohammadzad in which he attested that he "formerly owned [Buckingham]," which had "operated a single oriental rug [showroom] in Scranton." Gandomkar, an "Iranian national," had "shipped rugs from Uzbekistan to Buckingham's Scranton [showroom]" in 2005. Buckingham "shut down in or around 2007," and

6

Mohammadzad "moved to Texas in or around 2007 after closing down Buckingham's [showroom]." Mohammadzad also verified Buckingham's lack of business activity in Texas as detailed in its special appearance. And Mohammadzad stated that Ashly was "a Texas limited liability company that was formed in 2013."

In his response to Buckingham's special appearance, Gandomkar asserted that as of September 2022, Buckingham was still an "active corporation" and Mohammadzad was identified in the "Pennsylvania Department of State's certified records . . . as the current vice president of Buckingham, with a business address in Scranton." To his response, Gandomkar attached copies of those records.

Gandomkar also asserted that "the testimony of Ashly's former co-owner, Saeid Arsin," found in an affidavit attached to Gandomkar's response, showed that "Mohammadzad utilized Buckingham to transfer [Gandomkar's] Khotan rugs to Ashly's showroom in Houston," which, according to Gandomkar, "contradict[ed] . . . Mohammadzad's contention that Buckingham [had] never had any contacts with Texas and that it ceased to exist as of 2007."

Gandomkar further observed that in his pleadings, he had alleged that Mohammadzad, while acting "as an agent for both Buckingham and Ashly, . . . [had] endeavored to perpetrate a fraud on [Gandomkar] by obtaining the benefit of his rugs without paying him." And, according to Gandomkar, "to establish specific jurisdiction over Buckingham," it was "sufficient that Buckingham, acting

7

through . . . Mohammadzad, [had] intended to market and sell [Gandomkar's] rugs in Texas." "By "transfer[ring] [Gandomkar]'s rugs from Buckingham's showroom in Pennsylvania to Ashly's showroom in Texas," Buckingham had "purposefully availed itself of benefits and privileges of doing business in Texas."

In an affidavit attached to Gandomkar's response, Arsin attested that "[t]hrough [his] interactions" with Gandomkar and Mohammadzad, he "became aware that [Gandomkar] had previously acquired" about 110 Khotan rugs "in Uzbekistan and shipped them to . . . Mohammadzad and Buckingham . . . in Pennsylvania." "Sometime later," Arsin found certain "Khotan rugs belonging to . . . Gandomkar in Ashly's showroom in Houston, which . . . Mohammadzad had transferred from" Buckingham's showroom in Scranton.

The trial court granted Buckingham's special appearance and dismissed Gandomkar's claims against Buckingham for lack of personal jurisdiction.

**Standard of Review**

The existence of personal jurisdiction is a question of law, which must sometimes be preceded by the resolution of underlying factual disputes. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Paul Gillrie Inst., Inc. v. Universal Comput. Consulting, Ltd.*, 183 S.W.3d 755, 759 (Tex. App.—Houston [1st Dist.] 2005, no pet.). When the underlying facts are undisputed or otherwise established, we review a trial court's denial of a special appearance de

8

novo. *Paul Gillrie Inst.*, 183 S.W.3d at 759. Where, as here, a trial court does not issue findings of fact or conclusions of law with its special-appearance ruling, all fact findings necessary to support the judgment and that are supported by the evidence are implied. *Marchand*, 83 S.W.3d at 795; *Paul Gillrie Inst.*, 183 S.W.3d at 759.

A trial court determines a "special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3). A single basis for personal jurisdiction is sufficient to confer jurisdiction over a nonresident defendant. *See Citrin Holdings, LLC v. Minnis*, 305 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

The plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Am. Type Culture Collection v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002); *Paul Gillrie Inst.*, 183 S.W.3d at 759. The burden of proof then shifts to the nonresident defendant to negate all the bases of jurisdiction alleged by the plaintiff. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985); *see also Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010) ("Because the plaintiff

9

defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading.").

The nonresident defendant can negate jurisdiction on either a factual or a legal basis. *Kelly*, 301 S.W.3d at 659. Factually, the nonresident defendant can present evidence that it had no contacts with Texas, "effectively disproving the plaintiff's allegations." *Id.* The plaintiff can then respond with his own evidence affirming his allegations, and if he does not present evidence establishing personal jurisdiction, he risks dismissal of its suit. *Id.* Legally, the nonresident defendant can show that, even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the nonresident defendant's contacts with Texas do not constitute purposeful availment for specific jurisdiction; the claims do not arise from the contacts with Texas; or the exercise of jurisdiction offends traditional notions of fair play and substantial justice. *Id.*

A court need not assess the nonresident defendant's contacts on a claim-by-claim basis where, as here, all claims essentially arise from the same forum contacts. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150–51 (Tex. 2013); *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 537 (Tex. App.—Houston [1st Dist.] 2015, no pet.). If a case involves more than one nonresident defendant, the plaintiff must specify, and the court must examine, "each [nonresident] defendant's actions and contacts with the forum"; the defendants'

contacts cannot be aggregated. *See Morris v. Kohls-York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd); *see also Loya v. Taylor*, No. 01-14-01014-CV, 2016 WL 6962312, at *3 (Tex. App.—Houston [1st Dist.] Nov. 29, 2016, pet. denied) (mem. op.).

## Personal Jurisdiction

In his sole issue, Gandomkar argues that the trial court erred in granting Buckingham's special appearance and dismissing his claims against Buckingham because Texas has specific jurisdiction over Buckingham.

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Fourteenth Amendment's due process clause and the Texas long-arm statute are satisfied. *See* U.S. CONST. amend. XIV, § 1; TEX. CIV. PRAC. & REM. CODE ANN. § 17.042; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226–27 (Tex. 1991). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. The nonresident defendant "does business" in Texas if it "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part" in Texas, it "commits a tort in whole or in part" in Texas, or it "recruits Texas residents, directly or through an intermediary located in [Texas], for employment inside or outside the state." *Id.* The Texas Supreme Court has

11

consistently interpreted this statutory language "to reach as far as the federal constitutional requirements of due process will allow." *Guardian Royal*, 815 S.W.2d at 226. Therefore, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process limitations. *Id.*

The United States Constitution permits a state to assert personal jurisdiction over a nonresident defendant only if it has some minimum, purposeful contacts with the state and if the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. *Dawson-Austin v. Austin*, 968 S.W.2d 319, 326 (Tex. 1998). A nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the state has sufficient contacts with the state to confer personal jurisdiction. *See Guardian Royal*, 815 S.W.2d at 226.

The "purposeful availment" requirement has been characterized by the Texas Supreme Court as the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In *Michiana*, the supreme court articulated three important aspects of the purposeful availment inquiry. *Id.* at 785. First, only the nonresident defendant's contacts with the forum count. *Id.* This ensures that the nonresident defendant is not haled into a jurisdiction solely by the unilateral activities of a third party. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Second, the acts relied on must be

12

purposeful; the nonresident defendant may not be haled into a jurisdiction solely based on contacts that are "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). Third, the nonresident defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" because "[j]urisdiction is premised on notions of implied consent" and by "invoking the benefits and protections of a forum's laws, . . . [the] nonresident consents to suit there." *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The nonresident defendant's contacts with a forum can give rise to either general or specific jurisdiction. *Marchand*, 83 S.W.3d at 795. Specific jurisdiction is established if the nonresident defendant's alleged liability arises from or relates to an activity conducted within the forum. *Id.* at 796. When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship between the nonresident defendant, the forum, and the litigation. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575–76 (Tex. 2007).

Foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established minimum contacts with the forum state. *Burger King Corp.*, 471 U.S. at 474; *Guardian Royal*, 815 S.W.2d at 227. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the nonresident defendant and Texas, arising from

actions or conduct of the nonresident defendant purposefully directed toward Texas. *Guardian Royal*, 815 S.W.2d at 227.

Here, Gandomkar asserts that the trial court has specific jurisdiction over Buckingham based on the transfer of the consigned rugs by Mohammadzad, a Texas resident acting as Buckingham's agent, from Pennsylvania to Texas, which occurred in 2007, when Buckingham closed its Scranton showroom. But whether a defendant knows that its merchandise will be made available for sale in Texas is not enough to establish jurisdiction; the plaintiff must show that the defendant targeted the forum state, not just that it foresaw its merchandise ending up there. *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 13 (Tex. 2021); *see also CMMC v. Salinas*, 929 S.W.2d 435, 438–39 (Tex. 1996) (foreign manufacturer's knowledge that Texas was intended destination of its winepress was not enough to subject manufacturer to personal jurisdiction in Texas without evidence that manufacturer took additional steps to serve Texas market). Buckingham's single act of transferring its inventory to Ashly after it closed its Scranton showroom does not show that Buckingham sought some benefit, advantage, or profit from the Texas market. *See Michiana*, 168 S.W.3d at 785.

Gandomkar also argues that because Mohammadzad is a vice president and agent of Buckingham, his continuing contacts with Texas can be attributed to Buckingham. To hold Buckingham liable through Mohammadzad acting as its

agent, though, Mohammadzad's conduct must have been undertaken to further Buckingham's business. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 132 (Tex. 2018) (defining characteristic of principal-agent relationship, which is basis for imposing vicarious liability, is principal's right to control agent's actions undertaken to further principal's objectives).

Buckingham satisfied its burden to negate personal jurisdiction by proffering evidence with its special appearance that it did not, and had never: "owned any real estate in Texas"; "had an office or place of business in Texas"; "used, owned, or rented real or personal property in Texas"; "employed agents or employees in Texas"; "maintained bank accounts in Texas"; "kept books or records in Texas"; "paid any taxes in Texas"; "advertised for business in Texas"; or "consented to be sued or designate[d] an agent for service of process in Texas." *See Kelly*, 301 S.W.3d at 659. Buckingham also explained that "[t]he only connection" it had to Texas was that Mohammadzad "moved to Texas after he closed down Buckingham."

Gandomkar did not respond with any evidence to support a conclusion that Mohammadzad acted to further Buckingham's business in Texas at any time after Buckingham's transfer of the consigned rugs.[7] *See Painter*, 561 S.W.3d at 132. As

---

[7] Gandomkar does not assert, and his pleadings do not allege, that Buckingham's transfer of the consigned rugs from Pennsylvania to Texas constitutes an element of any tort claim he brought against Buckingham. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (nonresident defendant "does business" in Texas if it "commits a tort in whole or in part" in Texas).

a result, we hold that the trial court did not err in granting Buckingham's special appearance and dismissing Gandomkar's claims against Buckingham for lack of personal jurisdiction.

We overrule Gandomkar's sole issue.

## Conclusion

We affirm the order of the trial court granting Buckingham's special appearance.


Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.